UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | No. 2:08-CR-98 |
| | ) | |
| ANTONIO ROMERO CHAVEZ, | ) | |
| *ET AL.* | ) | |

**REPORT AND RECOMMENDATION
REGARDING MOTIONS TO SUPPRESS (DOCS. 63, 68)**

All five defendants in this case are charged with conspiring to distribute, and to possess with the intent to distribute, 500 grams or more of cocaine. The defendant Lopez has filed a motion to suppress evidence seized from his residence in Johnson City, Tennessee, on October 9, 2008, as well as evidence seized from a vehicle parked at that residence. (Doc. 63). The defendant Hernandez has been allowed to adopt and join in that motion to suppress. The defendant Heatherly has filed a motion to suppress statements she made to law enforcement officers on October 9, 2008, subsequent to her arrest. (Doc. 68).

These motions have been referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on December 4, 2008. Because most of the facts are common to both motions, they will be addressed in this single report and recommendation.

On October 9, 2008, at approximately 5:30 a.m., Deputy William Rhodes of the Washington County Sheriff's Department observed a black pickup truck weaving across the lines of US Highway 11-E in Washington County. Deputy Rhodes effected a traffic stop of that truck. The driver was

another of the defendants herein, Mr. Chavez, and Ms. Heatherly was his passenger. Mr. Chavez appeared to be under the influence of an intoxicant, either alcohol or drugs, prompting Deputy Rhodes to conduct a field sobriety test which Mr. Chavez failed. Chavez was arrested for driving under the influence and ultimately transported to the Washington County Detention Center.

Ms. Heatherly provided a false, or at least misleading, name to Deputy Rhodes. He reported to his dispatcher the name she provided and, because there were no warrants for anyone by that name, and because she did not appear to be intoxicated, Heatherly was allowed to leave.

An inventory search of Chavez's truck lead to the discovery of $20,000.00 in U.S. currency.[1] Because of the discovery of that large sum of currency, Agent Vince Walters, a Johnson City police officer attached to the DEA Task Force, was notified. In addition to being told about the circumstances surrounding the traffic stop and the $20,000.00, Agent Walters also was told that Chavez and Heatherly had mentioned that they were on their way to the Ideal Storage facility, which was approximately one-half mile from where they were stopped by Deputy Rhodes. Based upon his experience, Agent Walters suspected that Chavez and Heatherly were on their way to the storage facility to conduct a drug transaction. He immediately called the patrol officer who was responsible for that area to ask that he establish surveillance on the storage facility, but the officer was unavailable. As a result, Agent Walters went to the storage facility. It might be appropriate to note at this point that sometimes effective law enforcement results as much from dumb luck as much as it does from anything else. Agent Walters had no idea what, if anything, he would find or see at the

---

[1] A drug-sniffing dog also was walked around the truck, but there was no testimony regarding whether the dog alerted. In any event, it is of no significance since the money was discovered in the course of a legitimate inventory search and no defendant has challenged the seizure of the money.

2

Case 2:08-cr-00098-JRG Document 86 Filed 12/05/08 Page 2 of 10 PageID #: 145

Ideal Storage facility. But when he arrived at approximately 10:30 a.m., he saw a black Suburban SUV with three Hispanic males in it. Agent Walters was driving an unmarked car, and he was dressed in plain clothes. As Agent Walters drove into the fenced parking lot, the black Suburban vehicle was exiting. Agent Walters threw up his hand in greeting, and indicated that he was asking the driver to stop. Agent Walters took care not to block the exit as he did so. The driver (later learned to be the defendant Rodriguez) waved back, and he stopped.

Agent Walters got out of his own car and walked over to the driver, Chavez. Walters identified himself as a police officer, and he asked if Rodriguez would get out of his car and talk with him, which Rodriguez did. It should be noted at this point that Rodriguez spoke excellent English.

In the course of Agent Walters' conversation with Rodriguez, Rodriguez mentioned that he had a friend who had just been put in jail. Agent Walters, of course, immediately knew that Rodriguez was speaking of Chavez, who had been arrested for DUI several hours earlier. Rodriguez' passengers were Hernandez and Lopez, also defendants in this case. Another officer had arrived in the meantime, and he gave all three men their *Miranda* warnings, in English. The two passengers, Lopez and Hernandez, apparently did not speak English, so Rodriguez was requested to repeat, in Spanish, the *Miranda* warnings.[2]

Rodriguez acknowledged that he owned the SUV. Agent Walters requested permission to search the vehicle, and Rodriguez agreed. When Walters opened the rear hatch door of the vehicle, he observed a box that contained what was immediately identified as bundles of currency, wrapped

---

[2]Whether or not Rodriguez actually conveyed the *Miranda* warning to Lopez and Hernandez is not an issue before this court, since no motion regarding the warnings has been raised by either defendant.

3

in cellophane and duct tape. Next to this box of money was a plastic bag which contained a block of cocaine, approximately a kilo in weight. Rodriguez denied knowing anything about either the money or the cocaine.

In the meantime, someone at the Washington County Sheriffs Department had discovered who Ms. Heatherly actually was, and that an arrest warrant had been issued for her failure to surrender for service of a jail sentence. Agent Walters requested Mr. Rodriguez to use his cell phone to call Ms. Heatherly and ask that she meet him at the storage facility. Rodriguez made the call.

When Ms. Heatherly arrived at the facility as a result of Rodriguez' call, she was immediately *Mirandized* by Agent Walters. Also, she was observed by another officer to stuff something down the front of her pants, as a result of which a female officer on the scene, Amy Chizmar, conducted a pat-down search of Ms. Heatherly.[3]

All four individuals - Heatherly, Rodriguez, Hernandez, and Lopez - were arrested for drug trafficking and taken to the Washington County Detention Center. Deputy Chizmar speaks Spanish fluently; ethnically, she is one-half Guatemalan. She grew up in Texas, and spoke both Spanish and English from her youngest years. She obtained a Bachelor's Degree in Spanish from East Tennessee State University. She was asked to talk to Mr. Lopez, who speaks no English, to ascertain if he would consent to the search of his residence at 488 Washington College Road in Limestone. After some discussion with him, she asked him to sign a "Consent to Search" form, which was written in Spanish. This form had been authored by Deputy Chizmar. Mr. Lopez signed the form by printing his first name, "Elias."

---

[3] A glass bottle containing a number of pills was taken from Ms. Heatherly's pants. Those pills were not analyzed, and they now have been destroyed. She is not charged with anything regarding those pills.

4

Relying upon the consent of Mr. Lopez obtained by Deputy Chizmar, the officers proceeded to Lopez' residence at 488 Washington College Road, which was a single-wide mobile home. Because Ms. Heatherly earlier had advised the officers that someone had "messed with the wall" in this mobile home, a drug-sniffing dog was brought into the house, which alerted on the living room wall. The officers cut a hole through the wall paneling and inserted a small camera at the end of a flexible "snake" into the cavity, by which they were able to see a bundle wrapped in duct tape, which looked the same as those discovered in the Suburban vehicle at the storage facility. When this bundle was removed, it indeed was a bundle of currency, along with some receipts.

In the course of searching the mobile home, the officers were confronted with a locked door that lead into a bedroom. After forcing their way into the bedroom, they observed some documents therein that indicated that the bedroom was occupied by someone other than Mr. Lopez. Specifically, those documents indicated that Hernandez was the occupant of this room. Because they had no consent from Hernandez to search his bedroom, the officers immediately left the room without conducting a search. Deputy Chizmar called Mr. Hernandez and requested his permission to search the room, but he refused.

A Jeep Cherokee vehicle was parked behind the mobile home, and the drug dog was walked around it. The dog alerted on the vehicle, resulting in a search which revealed cellophane wrappers identical to those used to wrap the drugs and currency.

*HEATHERLY'S MOTION TO SUPPRESS HER STATEMENTS (DOC. 68).*

Ms. Heatherly argues that her statements should be suppressed because her mental state was impaired as a result of serious drug addiction, and therefore the statements were not voluntarily made.

When interviewed by Probation prior to her initial appearance before this court, defendant admitted to using cocaine and Lortabs on October 9, 2008. Thus, Ms. Heatherly was "under the influence" of both cocaine and Hydrocodone when she was given her *Miranda* warnings and made her statements to Agent Walters. Her use of cocaine and Lortab notwithstanding, the court finds that she was capable of understanding the *Miranda* warnings when they were given to her. Both Agent Walters and Deputy Chizmar testified that Ms. Heatherly was steady on her feet, appeared to be coherent, answered all questions appropriately, and otherwise appeared to be normal. Also, nothing about her actions or demeanor suggested to Deputy Rhodes immediately after the traffic stop that she was intoxicated; as far as he could tell, there was no reason to detain her, and she was allowed to leave. But, assuming *arguendo* that Ms. Heatherly was mentally deficient to some extent on October 9, 2008, when she made her statements, it is a condition precedent to a finding of involuntariness that there was some antecedent police coercion. *Colorado v. Connelly*, 479 U.S. 157 (1986). *See also, United States v. Newman*, 889 F.2d 88, 94-95 (6th Cir. 1989) (the defendant's mental impairment resulting from alcoholism was insufficient to establish that his statements were involuntary in the absence of any misconduct by the agents interrogating him), *cert*. denied, 495 U.S. 959 (1990). No police officer, including Agent Walters, coerced Ms. Heatherly or otherwise engaged in misconduct.

As a final matter, Agent Walters was cross-examined closely about his failure to use a written *Miranda* warning and waiver. To the extent the cross examination was intended to suggest that a *written* warning and a written waiver are required, such is incorrect. If defendant was attempting to suggest by the lack of any written form that the warning was not administered at all, the facts are otherwise. Agent Walters was an extremely credible witness, and he unequivocally testified that he

6

administered the *Miranda* warning to Heatherly immediately upon her arrival at the storage facility. Moreover, Deputy Chizmar testified that she heard him administer the warning.

With respect to Ms. Heatherly, she was given *Miranda* warnings; she understood those warnings; she thereafter made voluntary statements. It is therefore recommended that her motion to suppress be denied.

*LOPEZ' MOTION TO SUPPRESS EVIDENCE OF A SEARCH OF HIS RESIDENCE, ETC. (DOC. 63).*

Mr. Lopez argues that he speaks and understands only Spanish. Moreover, he asserts in his motion that he is completely illiterate as far as his native language is concerned, and he can neither read nor write it.

As an initial matter, Mr. Lopez stated in his motion that there was no Spanish-speaking law enforcement personnel or interpreters present when he executed the consent form. Attorney Leonard verbally withdrew that allegation during the hearing, after explaining why he had included it in his motion. As noted in the factual recitation above, Deputy Chizmar speaks fluent Spanish and it was she who dealt with Mr. Lopez regarding his consent to search the mobile home.

Mr. Randall Whittig testified on behalf of defendant. Mr. Whittig is well-known to this court; he often serves this court as a Spanish interpreter. Based upon Mr. Whittig's conversations with Mr. Lopez, Mr. Whittig is of the opinion that Lopez indeed is quite illiterate. Mr. Lopez himself did not testify, but for purposes of this report and recommendation it will be assumed that Mr. Lopez is illiterate.

The consent to search form which Mr. Lopez ultimately executed was prepared by Deputy Chizmar. Mr. Whittig criticized it extensively. For one thing, the Spanish title of the form - "Autorizar Um Registro De La Propiedad" - is intended to mean, "Consent to Search Property."

7

According to Mr. Whittig, "Registro" denotes "registration," not "consent." Deputy Chizmar, on the other hand, says that "registro" can mean either register or consent, depending upon the context. Mr. Whittig testified that that may be true in Guatemala, but not in Mexico, and defendant is Mexican.

Mr. Whittig also criticized the extreme formality of the Spanish wording in the body of the consent form, saying that some of those words made no sense. He also testified that the document generally was poorly worded, and that it contained several bad grammatical errors.

All that to which Mr. Whittig testified could have some significance if the consent form merely had been given to Mr. Lopez to read for himself, or if Deputy Chizmar had merely read the consent form to Mr. Lopez and done nothing else. However, Deputy Chizmar conversed with Mr. Lopez, and she *conversationally* told him the purpose of the consent form and what she and the other officers were requesting, *viz.*, permission to search his residence. Mr. Lopez understood what he was being asked to do, and he understood the purpose of the consent form. He certainly understood it as well as any illiterate English-speaking suspect does when an officer requests permission to search his property. Even if the consent form had been worded as Mr. Whittig testified it should have been, it would have made absolutely no difference since Mr. Lopez was illiterate; he could not have read it in any event. And, of course, if Deputy Chizmar had elected to read the form to Mr. Lopez, and done nothing else, better wording would have made no difference. But Deputy Chizmar colloquially told Mr. Lopez what was being asked of him. Deputy Chizmar was satisfied that he completely understood. Poor grammar and poor wording of the consent form notwithstanding, Mr. Lopez understood from his conversation with Deputy Chizmar that (1) he was being asked permission to search his trailer, and (2) that he had a right to refuse. He consented. Again, all the

8

emphasis on the written document obscures the fact that Chizmar discussed with Lopez what was being requested of him and his right to refuse.

It is respectfully recommended that Mr. Lopez' motion to suppress be denied.

*HERNANDEZ' MOTION TO SUPPRESS*

Mr. Hernandez was allowed to adopt Mr. Lopez' motion to suppress. If Mr. Lopez' consent to search was invalid, then obviously evidence of the money found in the wall cavity would be suppressed, to the benefit of both Lopez and Hernandez. However, it has been recommended that Mr. Lopez' motion to suppress be denied, and that recommendation applies to Mr. Hernandez for the same reasons.

Beyond the preceding, the court is not quite sure what Mr. Hernandez is complaining about. His room was not searched; he refused to give his permission for the officers to search his room, and it was not searched. On the assumption that he seeks suppression of the bundle of money found in the wall cavity that was discovered by the officers from the living room-side of the wall, that area was embraced within the consent to search granted by Mr. Lopez. The fact that the currency was placed in the wall cavity from an opening on Hernandez' side of the wall, i.e., from Hernandez' bedroom, is quite irrelevant as far as the motion to suppress is concerned. It bears repeating: the stash of currency was discovered by cutting into the wall from Lopez' side of the wall, not Hernandez'.[4]

Respectfully submitted,

---

[4]Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

9

s/ Dennis H. Inman
				United States Magistrate Judge